**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**Bid Protest**

|  |  |
|---|---|
| INSERSO CORPORATION, | ) |
| | ) <span style="color:red">**Redacted Version**</span> |
| | ) |
| *Plaintiff,* | ) |
| | ) No. ___23-1140C_____ |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) ████████████████████ |
| *Defendant.* | ) ██████████████████████ |
| | ) |
| | ) |
| | ) |

## COMPLAINT

Plaintiff, Inserso Corporation ("Inserso"), brings this pre-award protest challenging the decision of the Defendant, the United States of America, acting by and through the National Institutes of Health, Acquisition and Assessment Center ("NIH" or the "Agency"), to improperly reduce the scores assigned Inserso's proposal under Solicitation No. 75N98121R00001 (the "Solicitation") in a manner that resulted in Inserso not advancing to Phase II of the competition. As discussed below, the Agency's actions were unreasonable, contrary to law, and inconsistent with the terms of the Solicitation.

## NATURE OF THE ACTION

1.     The crux of Inserso's and the Agency's disagreement in this procurement is whether a Solicitation provision that, by its express terms, applies to indefinite-delivery, indefinite-quantity ("IDIQ") contracts and blanket purchase agreements ("BPAs") should also be reasonably understood as applying to requirements contracts.

---

[1] ████████████████████████. In accordance with Paragraph 8 of the GAO protective order, this Complaint is filed contemporaneously with a Motion for Leave to File Under Seal and with a Motion for Protective Order by this Court.

2.      The Agency contends that IDIQ contracts and BPAs should be defined as including requirements contracts.  Such an interpretation, however, is directly contrary to the plain terms of the Solicitation, the definitions of contract "types" set forth in the Federal Acquisition Regulation ("FAR"), and persuasive precedent interpreting the meaning of those terms.  Indeed, the United States Court of Appeals for the Federal Circuit has, in multiple reported decisions, affirmed that a requirements contract is different, as a matter of law, from an IDIQ contract and BPA.

3.      Critically, if the FAR definitions and terms of the Solicitation are followed, then Inserso would advance to Phase II of the competition being carried out under the Solicitation, as opposed to being eliminated from the competition.  In their Phase I proposals, offerors were to submit experience examples, with each example being assigned points that were based on the total dollar value of the example.  Inserso's Phase I proposal included its experience under the Air Force Civil Engineer Center's Information Technology Support Services ("AFCEC ITSS") contract, which Inserso calculated as having a dollar value of $57,857,735.17 and a points value of 1,950 under the general rules for calculating value as set forth in the Solicitation.  The AFCEC ITSS contract is, without dispute, a requirements contract.

4.      The Agency, however, applied the IDIQ/BPA provision in the Solicitation because, in the Agency's view, the terms "IDIQ contract" and "BPA" should be read to include requirements contracts such as the AFCEC ITSS contract.  Based on that erroneous interpretation, the Agency calculated the value of the AFCEC ITSS contract as being $5,592,110.46 instead of $57,857,735.17, which reduced the point value by 1,170 points (*i.e.*, from 1,950 points to only 780 points).  As a result of this significant point reduction, Inserso's proposal did not advance to Phase II and was eliminated from the competition.  But for the Agency's error in calculating the contract

value and points for the AFCEC ITSS contract, Inserso's Phase I score would have been hundreds of points above the thresholds for advancing to Phase II.

5.      Inserso respectfully requests that the Court enter a declaratory judgment providing that NIH's evaluation of Inserso's proposal was arbitrary, capricious, an abuse of discretion, and contrary to law.  Inserso also requests that the Court issue a permanent injunction enjoining NIH from proceeding with the procurement based on its erroneous interpretation and requiring NIH to reevaluate Inserso's proposal in accordance with the Solicitation and applicable law.

## PARTIES

6.      Plaintiff, Inserso, is a corporation registered under the laws of Virginia.[2]  Inserso has over 25 years of information technology ("IT") support experience, including over 16 years of providing IT support in the healthcare sector to federal agencies as a prime contractor. Additionally, Inserso is an incumbent contractor under the predecessor Chief Information Officer - Solutions and Partners 3 ("CIO-SP3") Small Business contract and has received more than $350 million in task order awards under that contract.  Inserso also was recognized as the top CIO-SP3 Small Business Contract during multiple NIH Acquisition and Assessment Center quarterly meetings.  The CIO-SP3 contract does not expire until April 29, 2024.

7.      The Defendant, the United States of America, is acting by and through the National Institutes of Health, Acquisition and Assessment Center.  NIH is the agency responsible for the procurement that is the subject of this protest.

---

[2] Plaintiff is not seeking preliminary injunctive relief at this time because Plaintiff and Defendant have agreed that the Agency will refrain from making new award decisions under the Solicitation prior to the resolution of this protest. Additionally, Inserso submitted a proposal as the managing member of a joint venture referred to as IS CIO JV (the "JV"), which also included the AFCEC ITSS contract as an experience example.  The JV has not filed a complaint at this time because the issues in the JV's evaluation relating to the AFCEC ITSS contract are substantially the same as the issues in this protest, and the Agency has agreed that, if Plaintiff receives a favorable decision in this protest, it will apply that decision to the JV's evaluation.

## JURISDICTION AND STANDING

8.      The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C.

§ 1491.  Under the Tucker Act, the Court of Federal Claims possesses jurisdiction to adjudicate

bid protests challenging, *inter alia*, "the award of a contract" or "any alleged violation of statute

or regulation in connection with a procurement."  28 U.S.C. § 1491(b)(1).  The Court of Federal

Claims has "jurisdiction to entertain such an action without regard to whether the suit is instituted

before or after the contract is awarded."  *Id.*  "To afford relief in such an action," the Court "may

award any relief that the court considers proper, including declaratory and injunctive relief except

that any monetary relief shall be limited to bid preparation and proposal costs."  28 U.S.C.

§ 1491(b)(2).

9.      Inserso has standing to bring this protest because it is an interested party.  *See* 28

U.S.C. § 1491(b)(1) (providing that the Court "shall have jurisdiction to render judgement on an

action by an interested party").  A party is "interested" if (a) it is "an actual or prospective bidder

with a direct economic interest in the procurement," and (b) was prejudiced by a significant error

in the procurement process.  *Trax Int'l Corp. v. United States,* 144 Fed. Cl. 417, 428 (2019).

10.      Here, the first prong of the interested party test – whether the plaintiff is an actual

or prospective offeror with a direct economic interest in the procurement – is met because Inserso

submitted a timely proposal in response to the Solicitation at issue in this protest.

11.      With regard to the second prong, the Court of Federal Claims has explained that

prejudice may be shown "either as part of, or in addition to, showing a direct economic interest."

*Trax Int'l Corp.*, 144 Fed. Cl. at 428.  In either scenario, an actual or prospective bidder must show

that, "but for the error, it would have had a substantial chance of winning the contract."  *Id.*

(emphasis omitted) (quoting *CliniComp Int'l, Inc v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018)).

12.     In considering questions of standing, and whether a party has a substantial chance of award, the Court of Federal Claims accepts the plaintiff's allegations as true and draws reasonable inferences in the plaintiff's favor.  *Preferred Sys. Sols., Inc. v. United States*, 110 Fed. Cl. 48, 56 (2013).  Further, the Court of Federal Claims has clarified that a plaintiff need only establish "allegational prejudice," a much lower standard than prejudice on the merits.  *Tele-Consultants, Inc. v. United States*, 142 Fed. Cl. 686, 693 (2019) (citing *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 695-96 (2010)).

13.     Here, Inserso has standing because it was prejudiced by NIH's improper reduction of its score for Phase I of the competition with respect to the points it should have received under the terms of the Solicitation for the AFCEC ITSS contract it submitted.  As further discussed below, the Agency erred by using $5,592,110.46 as the value of the AFCEC ITSS contract instead of $57,857,735.17, which prejudiced Inserso because, when the value is calculated as $5,592,110.46, it reduces Inserso's Phase I scores by 1,170 points.  In doing so, the Agency unreasonably lowered Inserso's Phase I score below the thresholds needed for advancing to Phase II of the competition.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     Description of the Acquisition

14.     The initial version of the Solicitation for the CIO-SP4 procurement was released on May 25, 2021.

15.     NIH subsequently amended the Solicitation sixteen times.  *See* Ex. 1 (the most recent version of the Solicitation) at 1.[3]

16.     The CIO-SP4 procurement seeks IT solutions and services related to health, biomedical, scientific, administrative, operational, managerial, and information systems requirements.  Ex. 1 at 1.  The Solicitation identified ten task areas within the scope of the procurement, including IT services, digital media, integration services, cybersecurity, cloud services, and software development.  *Id.* at 17.  Additionally, the Solicitation stated that its scope included "leading edge, emerging, and future cutting-edge technologies that will evolve over the life of this contract."  *Id.*

17.     Under the Solicitation, NIH is to award multiple IDIQ contracts against which Government agencies may place firm-fixed-price, cost-reimbursement, time-and-materials, or incentive task orders.  Ex. 1 at 1-2, 41-42.  The IDIQ contracts are to have a five-year base period of performance as well as a five-year option period of performance.  *Id.* at 32.  Task orders issued under the IDIQ contracts may have periods of performance of up to five years (including option periods).  *Id.*  Each awarded IDIQ contract has a ceiling value of $50 billion.  *Id.* at 44.

## II.     Socioeconomic Categories

18.     The competition was divided into ten different "socioeconomic categories," including Other Than Small Businesses, Emerging Large Businesses, Small Businesses, Woman Owned Small Businesses, and HUBZone Small Businesses.  Ex. 1 at 140.  Competitors within a socioeconomic category competed against other offerors in that category.  *Id.* at 139.  For example, offerors in the Small Business category only competed against other Small Businesses, and

---

[3] With the exception of Exhibit 1 (the Solicitation) and Exhibit 2 (the Solicitation Q&A), which include native page numbering, all citations to Exhibit page numbers herein correspond with the PDF page number(s) of the Exhibit being cited.

competitors in the Emerging Large Business category only competed against other Emerging Large Businesses.  *Id.* at 139-40.  Although offerors could only submit one proposal, an offeror could compete in multiple socioeconomic categories.  *Id.* at 141.

19.     The Solicitation estimated the number of awards that would be made in each category.  Ex. 1 at 137.  The Solicitation estimated that there would be 20 to 40 awards for the Emerging Large Business category, and 75 to 125 awards for the Other Than Small Business Category.  *Id.*  The Agency reserved the right to award additional contracts above those estimates.  *Id.*

20.     Inserso submitted its proposal in the Emerging Large Business and Other Than Small Business categories.

**III.    Proposal Instructions and Evaluation Criteria**

21.     The Solicitation divided the CIO-SP4 competition into three phases.  *See* Ex. 1 at 144-45.  In Phase I, NIH would evaluate the self-scoring that offerors submitted regarding relevant experience.  Inserso's protest involves NIH's evaluation of Inserso's self-scoring included in its Volume I, "Administrative and Self-Scoring Documentation," proposal during Phase I.

22.     Volume I was to consist of administrative information, a completed Attachment J.5 Self-Scoring Sheet, and self-scoring supporting documentation.  Ex 1 at 147.

23.     The required administrative information included data identifying, among other items, the offeror, task areas the offeror is proposing, the offeror's socioeconomic category or categories, data supporting the offeror's size status, and required contractor teaming arrangement or joint venture documentation (if applicable).  Ex. 1 at 150-51.

24.     When completing the Attachment J.5 Self-Scoring Sheet, offerors were required to calculate their own scores based on the various sections listed below.  Ex. 1 at 151-52.

| Section | Title | Possible Points |
|---|---|---|
| L.5.2.1 | Corporate Experience | 4,500 |
| L.5.2.2 | Leading Edge Technology Experience | 1,800 |
| L.5.2.3 | Federal Multiple Award Experience | 1,200 |
| L.5.2.4 | Executive Order 13779 | 300 |
| L.5.2.5 | CMMI Certification Level 2 | 300 |
| L.5.2.6 | Earned Value Management System | 300 |
| L.5.2.7 | Acceptable Estimating System | 300 |
| L.5.2.8 | ISO 9001 Certification | 300 |
| L.5.2.9 | ISO 20000 Certification | 300 |
| L.5.2.10 | ISO 27001 Certification | 300 |
| L.5.2.11 | Approved Purchasing System | 200 |
| L.5.2.12 | Facility Clearance Level | 200 |
| | Total Possible Points | 10,000 |

25.     The Corporate Experience and Leading Edge Technology Experience sections were the two heaviest-weighted sections and are the most relevant to Inserso's protest.

26.     For all of the experience sections (*i.e.*, Corporate Experience, Leading Edge Technology Experience, and Federal Multiple Award Experience), the Solicitation required offerors to provide relevant experience examples.  If an experience example was relevant, points would be awarded based on the dollar value of the example provided.  *See* Ex. 1 at 154, 156.  The Solicitation stated that "[t]he dollar value utilized for experience . . . is determined by the total dollars that were obligated (funded)."  *Id.* at 152; *see also id.* at 153 ("The dollar value of the corporate experience example is the total obligated (funded) value of the contract including exercised options.").

27.     A relevant Corporate Experience example submitted by an Emerging Large Business or Other Than Small Business with a value of $3 million to $7 million was worth 60

8

points, while an example with a value exceeding $31 million was worth 150 points.  *See* Ex. 1 at 154.  For Corporate Experience, offerors were required to provide relevant examples for each of the ten task areas that the offeror was proposing.  *Id.* at 153; *see also id.* at 154 (requiring Other Than Small Businesses and Emerging Large Businesses to provide Corporate Experience examples for "[a]ll ten task areas").  An offeror could propose up to thirty Corporate Experience examples but was limited to three examples per task area.  *Id.* at 153.  Therefore, an offeror could receive up to 1,500 points per contract (150*10) and 4,500 points total (150*10*3) for Corporate Experience.

28.     A relevant Leading Edge Technology Experience example submitted by an Emerging Large Business or Other Than Small Business with a value of $3 million to $7 million was worth 240 points, while an example with a value exceeding $31 million was worth 600 points. Ex. 1 at 156.  An offeror could propose up to three examples.  *Id.* at 155.  Therefore, an offeror could receive up to 600 points per contract and 1,800 points total for Leading Edge Technology Experience.

29.     The Solicitation stated that the experience examples "must be from the last three years prior to the date the solicitation was originally released (May 25, 2021)."  *See* Ex. 1 at 153 (Corporate Experience), 155 (Leading Edge Technology Experience).

30.     In the Q&A that was issued in connection with Amendment No. 0003 to the Solicitation, NIH indicated that "there are no limitations on the start date for these experience examples as it relates to calculating dollar values."  *See* Ex. 2 at 23 (Q&A No. 86).  Therefore, the Q&A provided that an experience example that was performed on or after May 25, 2018, would meet the three-year recency requirement regardless of when performance commenced.

31.     Additionally, the Solicitation stated:

Experience examples can be either a collection of orders or one single order placed under an IDIQ contract or BPA.  If an experience example is a "collection of orders" placed under an IDIQ contract or BPA, the dollar value will be the sum of all orders based on the methods above being applied to each individual order.  (If the maximum dollar value is achieved without submitting all the orders that have been awarded, then only submit those orders that achieve the maximum results for experience in L.5.2.1, L.5.2.2, and L.5.2.3).

Ex. 1 at 152.  As further discussed below, the plain language of the above-quoted provision (the "IDIQ/BPA provision") does not apply to requirements contracts, such as the AFCEC ITSS contract.

## IV.    Inserso's Proposal

32.    On August 20, 2021, Inserso submitted its proposal in response to the Solicitation. Thereafter, NIH issued five additional amendments to the Solicitation.  On February 3, 2022, Inserso acknowledged those amendments and resubmitted its proposal, as NIH requested.

33.    In the Exhibit J.5 Self-Scoring Sheet that Inserso submitted, Inserso calculated its total score as being 9,770 points out of a possible 10,000 points.  *See* Ex. 3 (Inserso's self-scoring sheet).  For Corporate Experience, Inserso determined that it should receive ███ points out of 4,500 possible points.  *Id.*  For Leading Edge Technology Experience, Inserso determined that it should receive ███ points out of 1,800 possible points.  As relevant to this protest, Inserso relied on its experience under the AFCEC ITSS contract for both the Corporate Experience and Leading Edge Technology Experience sections.  *See infra* Section V (discussing the AFCEC ITSS contract).

34.    The self-scoring documentation submitted by Inserso discussed how it calculated its points for Corporate Experience and Leading Edge Technology Experience.  *See* Ex. 4.

35.    For the Corporate Experience section, the AFCEC ITSS contract covered ███ of the ten task areas and, given its value of $57,857,735.17 (Ex. 4 at 473), provided Inserso with ███

points per task area for a total of 1,350 points under the Corporate Experience section. *Id.* at 8. For the Leading Edge Technology Experience section, the AFCEC ITSS contract, given its $57,857,735.17 value, provided Inserso with ██ points. *Id.* at 9.

36.     In Inserso's Attachment J.6 Self-Scoring Sheet Experience Template for the AFCEC ITSS contract, which was required to be completed as part of the self-scoring documentation for each experience example (*see* Ex. 1 at 154, 156), Inserso explained that the AFCEC ITSS contract had a period of performance of April 2012 through August 2018. Ex. 4 at 473. Inserso also explained why the contract was relevant to ██ areas under the Corporate Experience section, as well as its relevance to the Leading Edge Technology Experience section. *Id.* at 474-81. Additionally, Inserso utilized the option of having the AFCEC ITSS Contracting Officer Representative verify the information included in the Exhibit J.6 Self-Scoring Sheet Experience Template for the AFCEC ITSS contract. *Id.* at 482.

37.     In its self-scoring documentation, Inserso also included a Federal Procurement Data System ("FPDS") record that states that the AFCEC ITSS Contract was a "Single Award," "Indefinite Delivery / <u>Requirements</u>" contract. Ex. 4 at 483-85 (emphasis added).

38.     Nowhere in Inserso's self-scoring documentation—which, as discussed above, included information verified by the AFCEC ITSS Contracting Officer Representative, the FPDS record, and the Performance Work Statement—was the AFCEC ITSS contract characterized as an IDIQ contract or BPA. To the contrary, Inserso's AFCEC ITSS contract includes FAR clause 52.216-21, "Requirements," which, as discussed below and explained in the FAR, is a different "type" of contract than an IDIQ contract.

## V.      AFCEC ITSS Contract

39.      The AFCEC ITSS contract was awarded to Inserso on February 6, 2012.  Ex. 6 (the AFCEC ITSS contract) at 1.  Performance under the AFCEC ITSS contract ended in August 2018.  Ex. 4 (Inserso's self-scoring documentation) at 473.

40.      Under the AFCEC ITSS contract, AFCEC acquired all of its personnel, services, and technical and management support requirements that were within the scope of the contract (*e.g.*, systems administration, network engineering, and computer support services) from Inserso.  *See generally* Ex. 6.  There was a pre-determined scope of work for a pre-determined period of time for a single government customer.  The only variable was that, at the time of award, AFCEC could not define the specific level of support it needed.  Instead of ordering a specific level of support, the agency agreed to order all of its covered requirements from Inserso during the contract period, which is typical under a requirements contract.  *See* CIBINIC ET AL., FORMATION OF GOVERNMENT CONTRACTS 1338 (4th ed. 2011) ("The key feature [of a requirements contract] is that the legal obligation of the government is defined by its *needs* rather than by a fixed amount." (emphasis in original)).

41.      The AFCEC ITSS contract was structured with 41 contract line item numbers ("CLINs") in each year of performance.  *See* Ex. 6 at 4-106.  The CLINs were the same for each year of performance, with the exception of the first number in the CLIN, and all the option CLINs had a period of performance of one year.  *See id.*; *see also id.* at 110-21 (listing periods of performance).  To illustrate, CLIN 0001 was for "IT Support Work Leader Services" during the base period; CLIN 1001 was for "IT Support Work Leader Services" during the first option period; and CLIN 2001 was for "IT Support Work Leader Services" during the second option period.  *See id.* at 4, 24, 45.  This method of numbering the CLINs was the same for all CLINs during all

periods of performance, with each CLIN after the base period of performance being designated as an "OPTION."  *See id.* at 4-106 (capitalization in original).

42.     Under the AFCEC ITSS contract, AFCEC ordered work from Inserso by placing delivery orders in accordance with FAR 52.216-18, "Ordering."  Ex. 6 at 126.  The AFCEC ITSS contract stated that, pursuant to FAR 52.216-21, "Requirements," "the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule," as well as that Inserso "shall furnish to the Government all supplies or services specified in the Schedule and called for by orders."  *Id.* at 127.  When acquiring support under the AFCEC ITSS contract, AFCEC would periodically place orders with Inserso based on its actual needs.  ███████████ ████████████████████████████████████.

## VI.     Clarification Request and Inserso Response

43.     On February 17, 2023, NIH sent Inserso a clarification request regarding two of its contracts submitted as experience examples, including the AFCEC ITSS contract.  NIH's clarification request stated that it was validating the AFCEC ITSS contract at "$5,592,110.46 with a period of performance of 2/9/2018 – 8/30/2018," as opposed to "$57,857,735.17 with a period of performance [of] 4/2012 – 08/2018," as Inserso had used.  NIH also requested that Inserso "please clarify how your self-score contract amounts were determined . . . or advise if the contract amount shown was the result of a minor/clerical error."

44.     On February 21, 2023, Inserso responded to NIH's clarification request, explaining that the total contract value of $57,857,735.17 for the AFCEC ITSS contract was correct because it included all funding obligated under the contract and had been validated by the Contracting Officer Representative responsible for the contract.  Inserso also stated that the AFCEC ITSS

contract had been performed until August 2018, thereby satisfying the requirement that performance must have occurred on or after May 25, 2018.  Additionally, Inserso explained that the AFCEC ITSS contract was a "single-award contract for a single customer with a consistent scope of performance throughout its life," and that the $5,592,110.46 value that NIH was using did "not include all funding actions that occurred over the life of this contract."  Inserso included records validating the start and end dates of the contract, as well as the total obligated amount.

## VII.    Notification of Unsuccessful Offeror and Debriefing

45.     On March 31, 2023, NIH sent Inserso an unsuccessful offer notification stating that Inserso's proposal was not among the highest-rated proposals selected to advance to Phase II of the competition.  Also on March 31, 2023, NIH posted an "informational notice" to SAM.gov that identified "preliminary" awardees, which did not include Inserso.

46.     On April 1, 2023, Inserso timely submitted a request for debriefing.

47.     On April 20, 2023, NIH provided Inserso with a written debriefing, in which NIH indicated that Inserso's score for Phase I of the evaluation was below the threshold for advancing to Phase II.[4]  *See* Ex. 5 (Inserso's debriefing).  Although Inserso self-scored its proposal as receiving 9,770 points, which would have been high enough to advance to Phase II, NIH scored Inserso's proposal as receiving 8,540 points, which was below the points threshold or "cutline" for advancing to Phase II.  *See id.*

48.     In the debriefing, NIH stated that it reduced the score for the AFCEC ITSS contract from "$57,857,735.17, which was clarified to be the Total Contract Value and not the obligated amount during the allowed period of performance of 5/25/2018 through 5/25/2021

---

[4] As discussed below, Inserso filed its initial protest with the GAO on April 7, 2023.  NIH did not provide Inserso's debriefing until approximately two weeks after that date.  After receiving the debriefing, Inserso timely filed a supplemental protest at the GAO on May 1, 2023, based on new information provided in the debriefing.

($5,592,110.46), in accordance with Section L.5.2.1 [Corporate Experience] of the solicitation." *Id.* at 2.

49.     Therefore, instead of receiving a total of 1,950 points for the AFCEC ITSS contract under the ███ task areas for Corporate Experience (1,350 points) and Lead Edge Technology Experience (600 points), Inserso received a total of 780 points (540 points for the ███ task areas under Corporate Experience and 240 for Leading Edge Technology Experience).

50.     This difference of 1,170 points between Inserso's self-scoring and NIH's validation of the AFCEC ITSS contract placed Inserso's proposal below the 9,000- and 9,470-point thresholds for advancing to Phase II of the Other Than Small Business and Emerging Large Business categories, respectively.

## VIII.   Procedural History

51.     On July 11, 2023, Inserso filed a timely protest before the GAO, which was docketed as B-419956.264.   Among other protest grounds, Inserso argued that NIH acted unreasonably and contrary to the terms of the Solicitation by reducing the contract value of the AFCEC ITSS contract and the points awarded to Inserso for that contract.

52.     On May 1, 2023, Inserso filed a supplemental protest, which was docketed as 419956.314, based on information it learned from its debriefing that confirmed the deficiencies identified in Inserso's initial protest and revealed additional deficiencies in how NIH calculated the value of Inserso's experience examples.   In particular, Inserso argued that NIH departed from the requirement in the Solicitation that it calculate value based on the total dollar amount that was obligated or funded, including option periods, under Inserso's contracts, including the AFCEC ITSS contract.

53.     On May 10, 2023, NIH filed a corrected Agency Report arguing, among other things, that the points awarded for AFCEC ITSS contract, as a requirements contract, should be limited by the "collection of orders" language in the IDIQ/BPA provision, which the Agency described as a being a "caveat" to the general rules for calculating contract value.  According to the Agency, only delivery orders under the AFCEC ITSS contract that were performed after May 25, 2018 should be considered for purposes of determining the contract value and associated points.  Stated differently, the Agency broke the AFCEC ITSS contract down into discrete orders and only considered the value of orders performed after May 25, 2018, rather than considering the requirements contract to be a single contract, with its value determined by all work performed thereunder.  The Agency acknowledged that the AFCEC contract was a requirements contract, and that the Solicitation's IDIQ/BPA provision did not expressly reference requirements contracts, but it argued that IDIQ contracts and requirements contracts "are so similar in type that the Solicitation provision requiring IDIQ orders to be considered logically encompasses Requirements contracts and as such Requirements contract delivery orders."

54.     On May 18, 2023, Inserso filed Comments on the Agency Report, asserting that the Agency Report confirmed that NIH had erred by expanding the plain language of the IDIQ/BPA provision to include requirements contracts.  Moreover, the IDIQ/BPA provision does not provide for a deliver-order-by-delivery-order approach to determining recency.  Rather, Inserso explained that a reasonable interpretation of the IDIQ/BPA provision is that, if an IDIQ contract or BPA is used as an experience example, then the value will be calculated as "the sum of all orders" placed under that experience example, provided that the underlying IDIQ or BPA satisfies the three-year recency requirement.  Additionally, Inserso argued that, even if the IDIQ/BPA provision applied

to requirements contracts, its protest should nevertheless be sustained because there would be a latent ambiguity as to whether the IDIQ/BPA provision applied to requirements contracts.

55.     On June 7, 2023, Inserso and the Agency filed a joint request for the GAO to provide an outcome prediction.  On June 15, 2023, the GAO denied the parties' request, stating that it intended to issue a written decision.

56.     On June 29, 2023, the GAO issued a protected decision denying Inserso's protest. GAO issued a public decision on July 10, 2023.

57.     In its decision, the GAO sustained protests challenging the Agency's validation of offerors' self-scores and establishment of the cutlines used for determining which offerors advanced to Phase II of the competition.  *See generally Sys. Plus, Inc.*, B-419956.184 et al., 2023 WL 4460151 (Comp. Gen. June 29, 2023).  The GAO determined that the Agency had validated the self-scores of certain offerors whose proposals were above the cutline (*e.g.*, Inserso), but it could not produce documentation to demonstrate that it validated the self-scores of all offerors, including those below the cutlines.  *See id.* at *17-18; *see also id.* at *23 (stating that the evaluation documents indicated that the Agency did not adjust the self-scores of any offerors below the cutline).  The GAO also concluded that the Agency erred by establishing cutlines that were based on self-scores that had not been validated.  *Id.* at *21-23.

58.     Separately, the GAO denied Inserso's protest, finding that, "[d]espite not specifically addressing requirements contracts in the solicitation, we find no basis to question the agency's decision to consider individual delivery orders under a requirements contract separately, in a similar manner to the orders in an IDIQ contract or BPA, because the orders are individually funded."  *Sys. Plus, Inc.*, 2023 WL 4460151, at *42.  In other words, the GAO expanded the meaning of "IDIQ contract or BPA" to include any contract under which an order is placed.  *See*

*id.*  As discussed below, the GAO erred in reaching that conclusion, as the plain language of the Solicitation reflects that requirements contracts are not subject to the IDIQ/BPA provision that GAO relied on.  To the contrary, and just like any other type of contract (*e.g.*, firm-fixed-price contract, cost-reimbursement contract) submitted by an offeror as an experience example, the value of a requirements contract is equal to the total obligated amount so long as the experience is relevant and work was performed under the contract on or after May 25, 2018.

## CLAIMS FOR RELIEF

### COUNT I
### (Declaratory and Injunctive Relief)
### NIH's Reduction Of The Points Assigned To The AFCEC ITSS Contract Was Arbitrary, Capricious, And Contrary To The Terms Of The Solicitation.

59.     Inserso incorporates by reference paragraphs 1 through 58 of this Complaint as if set forth herein.

60.     The Agency reduced the value of Inserso's AFCEC ITSS contract because it only considered the value of delivery orders performed under the AFCEC ITSS contract that were performed after May 25, 2018.  In doing so, the Agency relied on its interpretation of the IDIQ/BPA provision.

61.     Before the GAO, the Agency did not dispute that the AFCEC ITSS contract is a requirements contract and did not dispute that a requirements contract is a different type of contract than an IDIQ contract.  Rather, the Agency argued that the IDIQ/BPA provision should be interpreted to include requirements contracts because the term IDIQ contract "logically encompasses Requirements contracts."

62.     The IDIQ/BPA provision, however, does not apply to requirement contracts such as the AFCEC ITSS contract.  The plain language of the IDIQ/BPA provision provides that it only applies to an experience example that is an "IDIQ contract or BPA."  *See* Ex. 1 at 152 (emphasis

added).  The first sentence of the provision explains that "[e]xperience examples can be either a collection of orders or one single order placed under an IDIQ contract or BPA," thereby confirming that offerors can use IDIQ contracts and BPAs as experience examples.  *Id.* (emphasis added).  The second sentence explains that, "[i]f an experience example is a 'collection of orders' placed under an IDIQ contract or BPA, the dollar value will be the sum of all orders."  *Id.* (emphasis added).

63.    Both sentences in the provision explicitly reference IDIQ contracts and BPAs, which indicates that the provision only applies to IDIQ contracts, BPAs, and task orders placed thereunder.  The plain language of the provision does not attempt to encompass other types of contracts, such as cost-reimbursement contracts, labor-hour contracts, or requirements contracts, nor does it provide any indication that it should be read to include other types of contracts.  Indeed, before the GAO, Agency counsel and the Contracting Officer both acknowledged that the IDIQ/BPA provision does not reference requirements contracts, with the Contracting Officer stating that the "Government did not explicitly state how requirements contract should be evaluated."  The GAO reached the same conclusion, stating that the Solicitation did "not specifically address[] requirements contracts."  *See Sys. Plus, Inc.*, 2023 WL 4460151, at *42.

64.    A reasonable offeror would not have interpreted the words "IDIQ contract or BPA" to include a requirements contract because a requirements contract is neither an IDIQ contract nor a BPA.  FAR Part 16 defines "types of contracts."  The regulation at FAR 16.503(a) states that a requirements contract is used "for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period (from one contractor), with deliveries or performance to be scheduled by placing orders with the contractor."  Contrastingly, an IDIQ contract is used "when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require

during the contract period, and it is inadvisable for the Government to commit itself for more than a minimum quantity."  FAR 16.504(b).  A BPA "is a simplified method of filling anticipated repetitive needs for supplies or services by establishing 'charge accounts' with qualified sources of supply."  FAR 13.303-1(a).  Thus, the FAR expressly distinguishes between requirements contracts, IDIQ contracts, and BPAs, and it separately defines those terms as a matter of law.

65.  Caselaw also distinguishes requirements contracts – very clearly – from IDIQ contracts and BPAs.  *See Varilease Tech. Grp., Inc. v. United States*, 289 F.3d 795, 799 (Fed. Cir. 2002) ("An ID/IQ contract differs from a requirements contract in that the former does not oblige the buyer to purchase more from the seller than a stated minimum quantity, whereas the latter obliges the buyer to buy from the seller all of its requirements of the relevant goods or services."); *see also Mod. Sys. Tech. Corp. v. United States*, 979 F.2d 200, 205 (Fed. Cir. 1992) (rejecting an argument that a BPA was a requirements contract when the BPA did not "manifest an intention on the part of the Postal Service to obtain all of its requirements from the supplier"); *United Medical Supply Co., Inc. v. United States*, 63 Fed. Cl. 430, 436 n.4 (2005) ("A requirements contract differs from an indefinite-quantity contract in that the Government need not guarantee a minimum purchase amount, but must buy all of its specified requirements from the contractor."  (citations omitted)).

66.  The terms IDIQ contract, BPA, and requirements contract, therefore, each have their own defined meaning that reasonable offerors would be familiar with when reviewing the Solicitation.  Expanding the ordinary meaning of "IDIQ contract or BPA" to include additional types of contracts that are not identified in the Solicitation, as the Agency did, would be contrary to the plain meaning of the Solicitation and would upend offerors' reasonable expectation that the provision would only apply to IDIQ contracts and BPAs.  *See Banknote Corp. of Am. v. United*

*States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) ("If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning.").  It would also violate basic principles of textual interpretation by incorporating additional, omitted terms (*i.e.*, requirements contracts) into the IDIQ/BPA provision.  *See, e.g.*, ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) ("Nothing is to be added to what the text states or reasonably implies . . . . That is, a matter not covered is to be treated as not covered.").

67.     The "collection of orders" language in the IDIQ/BPA provision also is inapposite for a requirements contract because it is well established that orders issued under a requirements contract "represent only the Government's exercise of then existing contractual rights and do not equate to the issuance of separate, individual contracts."  *See Honeywell Fed. Sys. Inc.*, ASBCA No. 36227, 89-1 BCA ¶ 21,258.  In other words, orders placed under a requirements contract are considered to be part of the requirements contract itself, as opposed to stand-alone contracts.

68.     Moreover, interpreting the IDIQ/BPA provision as applying only to IDIQ contracts and BPAs, with the general rule for calculating value applying to requirements and all other types of contracts, gives meaning to all of the provisions in the Solicitation and would be consistent with the ordinary meanings of IDIQ contract, BPA, and requirements contract.  There would be no conflict between the two provisions, and neither provision would be rendered superfluous.

69.     Additionally, before the GAO, the Agency did not produce any contemporaneous documents to support its conclusion that, when evaluating the AFCEC ITSS contract, it found orders under a requirements contract to be so similar to task orders issued under an IDIQ contract that requirements contract should be treated as being subject to the IDIQ/BPA provision.  This lack of contemporaneous documentation further undermines the Agency's proffered interpretation, as there is no evidence that the Agency reached its interpretation during the procurement as

opposed to after the GAO protest was filed.  Furthermore, even if the Agency did interpret the IDIQ/BPA provision as applying to requirements contracts, the Court should nevertheless reject such an interpretation because it is inconsistent with the plain language of the Solicitation.  *See WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 274 (2021) ("The Court rejects the government's attempt to avoid the Solicitation's plain language by asserting that the Agency merely decided to read it differently.")

70.      By treating the AFCEC ITSS contract as being subject to the IDIQ/BPA provision, and then interpreting that provision as imposing a three-year recency requirement for all orders placed under the contract, the Agency unreasonably reduced the value of the AFCEC ITSS contract.  The Agency should have calculated the value of the AFCEC ITSS contract under the general rules for calculating contract value, which would have considered the entire value of the work performed under the AFCEC ITSS contract, given that the contract was performed on or after May 25, 2018.

71.      Specifically, under the general rules for calculating contract value, the AFCEC ITSS contract satisfied the Solicitation's recency requirement because work was performed under the contract after May 25, 2018.  *See, e.g.*, Ex. 4 at 473 (stating that the AFCEC ITSS contract was performed until August 2018).  The work that Inserso performed under the AFCEC ITSS contract after August 2018 was the same type of work for the same customer as the work that was performed earlier under the contract.  Inserso validated the performance period of the AFCEC ITSS contract with a form that was signed by the Contracting Officer's Representative for that contract and a record from the FPDS.  *See id.* at 472, 481-82 (Inserso's supporting documentation).  The Agency, therefore, was required to calculate its value based on the total dollar amount that was obligated, including option periods, under the AFCEC ITSS contract.  *See* Ex. 1 at 152 ("The dollar value

utilized for experience . . . is determined by the total dollars that were obligated (funded)."); *see also id.* at 153 ("The dollar value of the corporate experience example is the total obligated (funded) value of the contract including exercised options.").

72.     Inserso submitted documentation to NIH that demonstrated that AFCEC obligated $57,857,735.17 to the AFCEC ITSS contract during its course of performance, including the form that was signed by the Contracting Officer's Representative and the FPDS record. *See* Ex. 4 at 472, 481-82.  Under the terms of the Solicitation, those documents were sufficient for purposes of validating contract value.  *See* Ex. 2 at 23 (stating that an FPDS record "validates the obligated amount of the performance experience").  Because the AFCEC ITSS contract was performed after May 25, 2018, and because AFCEC obligated $57,857,735.17 to the contract during performance, the Solicitation required the Agency to use $57,857,735.17 as the value for that experience example.  *See* Ex. 1 at 152-53.

73.     The Agency's error of using $5,592,110.46 as the value of the AFCEC ITSS contract instead of $57,857,735.17 prejudiced Inserso because, when the value is calculated as $5,592,110.46, the contract is only worth 540 points under the Corporate Experience section and 240 points under the Leading Edge Technology Experience section, for a total of 780 points.  The Agency's error, therefore, reduced Inserso's Phase I scores by 1,170 points (*i.e.*, by 810 points under Corporate Experience and 360 points under Leading Edge Technology Experience).  In reducing the points assigned to Inserso's Phase I proposal, the Agency unreasonably hindered Inserso's ability to advance to Phase II of the competition.

74.     But for NIH's error, Inserso's Phase I score would have been at least 9,710 points, which is significantly higher than the previously established thresholds of 9,000 and 9,470 points for advancing to Phase II of the Other Than Small Business and the Emerging Large Business

categories, respectively.  Inserso, therefore, would advance to Phase II of the competition in the reevaluation and would have a substantial chance of receiving an award.  *See, e.g.*, *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 660 (2008) (finding that a protestor was prejudiced by an agency's evaluation error when, but for the error, the protestor would have been included in the competitive range); *McGoldrick Constr. Servs. Corp.*, B-409252.2, 2014 WL 1410178, at *8 (Comp. Gen. Mar. 28, 2014) (finding that a protester was prejudiced by an agency's evaluation error when the protestor would have advanced to the second phase of a competition but for the error).  In fact, in the prior evaluation, ██ of the ██ offerors that advanced to Phase II were selected to receive a contract award, which indicates that Inserso would have had a substantial chance of also receiving a contract award.

## COUNT II
### (Declaratory and Injunctive Relief)
### Alternatively, The Solicitation Contained A Latent Ambiguity Regarding How The Value Of Requirement Contracts Would Be Calculated.

75.     Inserso incorporates by reference paragraphs 1 through 74 of this Complaint as if set forth herein.

76.     Even if the Agency's "logically encompassed" interpretation is reasonable (it is not), it would, at best, create a latent ambiguity that would be construed against NIH.

77.     As discussed above, a reasonable offeror would have interpreted the IDIQ/BPA provision as applying only to IDIQ contracts and BPAs.  If the Court were to conclude that the Agency's "logically encompassed" interpretation is reasonable, then there would be two reasonable interpretations, which would produce an ambiguity, and the Court would need to decide whether the ambiguity is patent or latent.

78.     A patent ambiguity is "an obvious omission, inconsistency or discrepancy of significance," *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016), such as

when the solicitation "contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000). A latent ambiguity "is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Per Aarsleff A/S*, 829 F.3d at 1312 (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997)).

79.     The Court of Federal Claims determines whether an ambiguity is latent or patent "through the lens of a reasonable, intelligent person acquainted with the contemporaneous circumstances." *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 407 (2022). A latent ambiguity "will be construed against the Government as the drafter." *See, e.g.*, *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 238 (2021).

80.     Here, any ambiguity regarding whether the IDIQ/BPA provision applies to requirements contracts would be latent because Inserso's interpretation was reasonable, consistent with Federal procurement law, and did not conflict with any other provisions in the Solicitation. In fact, the Contracting Officer's statement of facts submitted to the GAO further supports that the Solicitation was not patently ambiguous, as he acknowledged that "the Government did not explicitly state how requirements contract should be evaluated." Thus, Inserso's interpretation of how requirements contracts would be evaluated (*i.e.*, with the entire value of a requirements contract being considered, provided that the contract was performed after May 25, 2018) was not facially inconsistent with any other Solicitation provision.

81.     Additionally, the issue of how a requirements contract should be evaluated did not arise until the Agency was evaluating Phase I proposals, which further demonstrates that an ambiguity would be latent.  *See G4S Secure Integration LLC*, 161 Fed. Cl. at 407 ("This is precisely what a latent ambiguity is: latent ambiguities are of the sort that are unknowable until there is some 'objective circumstance[ ]' that makes multiple interpretations reasonable." (alteration in original) (quoting *Travelers Cas. & Sur. Co. of Am. v. United States*, 75 Fed. Cl. 696, 711 (2007))); *see also See Singleton Enters.,* B-298576, 2006 WL 3069473, at *4 (Comp. Gen. Oct. 30, 2006) ("Since Singleton's interpretation of the [request for proposals] did not directly conflict with any of the other solicitation provisions, and the ambiguity came to light in the context of the agency's past performance evaluation, we conclude that the ambiguity here was latent rather than patent.").

82.     Thus, to the extent that there was an ambiguity, it would have been a latent ambiguity.  To remedy the latent ambiguity, the Agency should reevaluate the AFCEC ITSS contract in accordance with Inserso's interpretation, as Inserso relied on its reasonable interpretation when submitting its proposal.  *See Blue Tech Inc.*, 155 Fed. Cl. at 245 (finding that a solicitation "should be construed against the Government as the Solicitation's drafter" when it contained a latent ambiguity); *see also CGS-SPP Sec. Joint Venture v. United States*, 158 Fed. Cl. 120, 131 (2022) ("Courts apply the general rule of *contra proferentem* 'to construe ambiguities against the drafter,' which in this case is the defendant."  (quoting *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004))); *Millennium Corp.*, B-416485.2, 2018 WL 4772342, at *5 (Comp. Gen. Oct. 1, 2018) (recommending, in a multiple-award procurement, that an agency reevaluate a protestor's proposal in accordance with the protestor's interpretation and determine whether the protestor should also be awarded a contract when the solicitation was

latently ambiguous).  As discussed above, had the Agency evaluated the AFCEC ITSS contract in accordance with Inserso's reasonable interpretation, Inserso's Phase I score would have been at least 9,710 points, which is significantly higher than the previously established thresholds of 9,000 and 9,470 points for advancing to Phase II of the Other Than Small Business and the Emerging Large Business categories, respectively.  Inserso, therefore, would advance to Phase II of the competition in the reevaluation and would have a substantial chance of receiving an award if the Solicitation were construed in accordance with its interpretation.

83.    Alternatively, the Agency could reopen the competition, clarify the latent ambiguity, and allow offerors submit revised proposals.  *See, e.g.*, *Harper Constr. Co.*, B-415042 et al., 2017 WL 7409774, at *3 (Comp. Gen. Nov. 7, 2017) ("Where there is a latent ambiguity, both parties' interpretation of the provision may be reasonable, and the appropriate course of action is to clarify the requirement and afford offerors an opportunity to submit proposals based on the clarified requirement.").

84.    In sum, it was arbitrary, capricious, an abuse of discretion, and contrary to the terms of the Solicitation for the Agency to reduce the value of the AFCEC ITSS contract and Inserso's score for Phase I.

*      *      *

## REQUEST FOR RELIEF

Inserso respectfully requests this Court enter judgment in Plaintiff's favor and grant the following relief:

1.    A Declaratory Judgment providing that NIH's evaluation of Inserso's proposal was arbitrary, capricious, an abuse of discretion, and contrary to law;

2.      Permanent injunctive relief (i) enjoining NIH from proceeding with the procurement based on Inserso's erroneously awarded Phase I scores; and (ii) requiring NIH to reevaluate Inserso's proposal in accordance with the Solicitation and applicable law;

3.       An award to Inserso of its reasonable bid and proposal preparation costs; and

4.      Such other relief as the Court may deem just and proper.

Respectfully submitted,

Richard P. Rector
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Tel: (202) 799-4400
Fax: (202) 799-5400
E-mail: richard.rector@us.dlapiper.com
*Counsel for Inserso Corporation*

Of Counsel:

Thomas E. Daley
David R. Lacker
DLA Piper LLP (US)

Dated: July 24, 2023

## TABLE OF EXHIBITS

| Exhibit No. | Description |
|:---:|:---|
| 1 | The Solicitation |
| 2 | Solicitation Q&A |
| 3 | Inserso's Self-Scoring Sheet |
| 4 | Inserso's Self-Scoring Documentation |
| 5 | Inserso's Debriefing |
| 6 | The AFCEC ITSS Contract |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Plaintiff's Sealed Complaint, filed via electronic filing with the Court on July 24, 2023, was served on July 24, 2023, upon the following via email:

> Reta E. Bezak
> U.S. Department of Justice
> Commercial Litigation Branch
> 1100 L Street, NW, 8th Floor
> Washington, DC 20530
> Reta.E.Bezak@usdoj.gov
>
> Ricky Clark, Contracting Officer
> National Institutes of Health
> CIOSP4.NITAAC@nih.gov

Respectfully submitted,

<u>s/Richard P. Rector</u>
Richard P. Rector
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Tel: (202) 799-4400
Fax: (202) 799-5400
E-mail: richard.rector@us.dlapiper.com
*Counsel for Inserso Corporation*